IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 07-cv-02025-WDM-BNB

AIR METHODS CORPORATION,

    Plaintiff,

v.

OPEIU and OPEIU LOCAL 109,

    Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Miller, J.

This matter is before me on the Motion for Summary Judgment (doc no 18) filed by Plaintiff Air Methods Corporation ("Air Methods" or "AMC") and the Motion for Summary Judgment (doc no 17) filed by Defendants OPEIU and OPEIU Local 109 (collectively "Union"). Upon review of the parties' filings, I conclude oral argument is not required. For the reasons that follow, Air Methods' motion will be granted and the Union's motion will be denied.

### Background[1]

Plaintiff Air Methods filed this lawsuit seeking vacation of an arbitration award issued pursuant to the Railway Labor Act, 45 U.S.C. § 151 *et seq.* Air Methods is an air carrier providing contract air medical transport service, primarily by helicopter. Pursuant to the Railway Labor Act, the National Mediation Board certified the Union as the

---

[1]The facts are drawn from the parties' briefs and attached exhibits and are undisputed unless otherwise noted.

exclusive bargaining agent for AMC's pilots in 2003.  The Union and Air Methods engaged in negotiations over the course of three years and ultimately the first collective bargaining agreement ("CBA") took effect on January 1, 2006.  The Union filed a grievance in May 2006 regarding payment of a certain category of pilots, classified as relief pilots (see below).  The matter eventually was referred to Arbitrator William L. McKee.  An arbitration hearing took place on June 11, 2007.  Arbitrator McKee issued an award in favor of the Union dated September 6, 2007.

The dispute specifically focused on the payment of "relief" pilots.  Pursuant to the CBA, there are several categories of pilots:

> Section 19.1: A full-time Pilot is a Pilot who is assigned to a regular work schedule at a specific base or program.
>
> Section 19:2: A Relief Pilot is a full time Pilot who fills vacancies at any base as directed by the Company.
>
> Section 19.3: A temporary Full Time Pilot is a Pilot temporarily assigned to cover a specific vacancy arising due to a Full Time Pilot's leave of absence.  Such Pilots will be allowed to bid for any open position after serving for six months as a Temporary Full Time Pilot.  A Temporary Full Time Pilot's status shall coincide with the reinstatement rights of the Full Time Pilot returning from his/her Leave of Absence.  A newly hired Temporary Full Time Pilot shall not qualify for benefits under the Severance pay provisions of this Contract.
>
> Section 19.4: A Part Time/Per Diem Pilot is a Pilot who is offered work consistent with the Company's Customer Service or operational requirements.  Such Pilots shall not have a regular work schedule, nor be eligible to participate in Company benefit programs as defined elsewhere in this Contract . . . .  Such Pilots shall be paid on a per diem basis in accordance with the published pay scale . . . .
>
> Section 19.5: The Company shall not use Temporary Full Time or Part Time/Per Diem Pilots to avoid filling Full Time

2

> Pilot positions. The Company shall not use Part Time/Per
> Diem Pilots to cover vacant shifts when a current and
> qualified Full Time or Relief Pilot is available.

Exh. A-3 to Plaintiff's Motion for S.J. (doc no 19-4) at 25-26.

Testimony at the hearing clarified that Air Methods operates out of numerous bases located around the United States. Full time pilots, who comprise the vast majority of AMC's pilots, are assigned to these bases. Relief pilots, of which there are approximately 10, can live anywhere they wish and travel to the various bases to fill vacancies as directed by a central scheduling office; their travel time reporting to a base, however, is considered a "shift." Otherwise, the CBA sets forth the following provisions regarding scheduling:

> Section 16.1: Pilots at each base shall determine the
> appropriate schedules of service consistent with Company
> and customer service requirements. They shall forward their
> schedule to the appropriate Company official. A normal
> scheduled shift shall not exceed twelve (12) hours. This
> section will not relieve any Pilot from accepting any flight that
> may extend the shift beyond the scheduled twelve (12) hours
> as long as the flight can be conducted in accordance with
> the applicable FAR's and Company duty time policies.
>
> Section 16.2: The parties to this agreement will maintain
> schedules of service which provide for one (1) day off for
> each day scheduled.
>     Example:    7 days on - 7 days off
>                            4 days on - 4 days off
> The Pilot's salary is based upon 182 ½ work shifts per year.
>
> Section 16.3: Other work schedules will be discussed
> between the parties. However, both parties recognize
> schedules of service will meet customer requirements.
>
> Section 16.4: The schedule in Section 16.2 of this Article
> shall be considered standard. Any other schedules shall be
> considered non-standard. Non-standard schedules shall be
> filled on a voluntary basis. Vacancies in a standard schedule

3

resulting from temporary Pilot absences caused by illness,
injury, vacation, holidays, training or leaves of absences
shall not be considered a non-standard schedule.

Exh. A-3 to Plaintiff's Motion for S.J. (doc no 19-4) at 21-22. Evidence presented at the hearing showed that each of Air Methods' bases had different needs and flying frequency; therefore, the company and Union agreed that it was best to allow pilots assigned to bases to develop their own schedules to best fit their own needs and the demands of the base, subject to the company's final approval.

The issue in dispute concerns payment for "workover" shifts[2]. According to testimony at the hearing, before the CBA, pilots who worked shifts on a scheduled day off would generally receive an additional day's pay (over their annual salary); however, relief pilots would only receive the additional pay after they had worked 182 ½ shifts in the year. The CBA made the following provisions regarding workover:

Section 17.1  Workover Assignment Procedure

The Union recognizes the importance of the Company's
ability to provide 24/7 coverage to remain competitive in the
marketplace and will use their best efforts to achieve this.

A workover is defined as being scheduled for and reporting
to work on a regularly-scheduled day off.

Before offering workover to Pilots at a particular base, the
Company reserves the right to utilize Relief or Part-time
Pilots. If no Relief Pilots or Part-time Pilots are available,
workover shall be offered . . . [setting forth procedures].

Section 17.3 Workover Pay

---

[2]As understood by both the Union and Air Methods, "workover," additional pay for working additional shifts, is distinguished from "overtime." Overtime means additional or premium pay for working a longer shift than the standard 12 hours. Overtime is not at issue in this case.

4

> Effective January 1, 2006, Pilots shall receive one-and-one-half times (1-1/2 X) their normal daily rate, excluding supplemental pay and ACCRA. A workover shift is defined as being scheduled for and reporting for work on a regularly scheduled day off that was not the result of a trade or swap.

Exh. A-3 to Plaintiff's Motion for S.J. (doc no 19-4) at 22, 24.

It is undisputed that relief pilots receive a full-time salary, which is based on 182 ½ shifts, regardless of how many shifts they actually work. Evidence at the hearing indicates that relief pilots may work very few shifts in some months and more in other months, may be assigned to one base for an extended time or be sent to numerous bases over a shorter period of time, all as directed by the company. Air Methods takes the position that relief pilots are entitled to workover premium pay, but only after they have worked 182 ½ shifts and thereafter take on additional shifts. The Union takes the position that any time a relief pilot works a day that was previously unscheduled, the relief pilot should receive workover premium pay, regardless of how many shifts the pilot has worked up to that point. In the grievance, the Union stated that relief pilots were not being paid "the work-over rate of pay for days worked beyond a one-for-one work schedule in each pay period." Exh. 2 to Union's Motion for S.J. (doc no 17-5). The arbitration hearing transcript shows that both parties understood that the purpose of Section 17.1 was ensuring flexibility in scheduling while maintaining economic efficiencies by paying "straight" time (i.e., regular pilot salaries) rather than premium pay as much as possible. Indeed, Section 17.1 expressly conditions workover pay upon the unavailability of any relief or part time pilots ("If no Relief Pilots or Part-time Pilots are available, workover shall be offered as follows: [procedures not including relief pilots]"). Testimony from a Union representative confirms that the Union agreed to Section 17.1

5

because "We want to make sure they have the latitude to cover the work without having to pay the premium pay if possible." Exh. 7 to Defendant's Response (doc no 21-3) at 37.

The CBA contains integration clauses and specifically sets forth that "any past practices established prior to the date of this Agreement shall not create any contractual or legal obligation to continue such practices following the effective date of this Agreement." CBA Section 37.2, Exh. A-3 to Plaintiff's Motion for S.J. (doc no 19-4) at 44.

Arbitrator McKee adopted the Union's position regarding workover. Exh. A-1 to Plaintiff's Motion for S.J. (doc no 19-2). The arbitrator, after reviewing the provisions discussed above, noted that "[a] close reading of Articles 16 and 19 reveals that 'regular schedule' is the operative term of importance, and that regular schedules apply to assignments and vacancies, rather than to individual pilots." *Id*. at 7. To reach this conclusion, Arbitrator McKee noted that the language in Section 19.4 excludes regular work schedules for Part Time/Per Diem Pilots. Id. "An established maxim of contract construction holds that 'the expression of one thing is the exclusion of another,' which, in the context of this Agreement, is the same as 'the expressed exclusion in one thing is the inclusion in another.'" *Id*. The arbitrator thus determined that, "[b]y excluding regular work schedules from one Pilot classification, in other words, the language reveals the parties' intention for other Pilot classifications to work the regular schedules associated with their regular or relief assignments." *Id*. He further concluded that the language of Section 19.1 "also makes it clear that Pilots are assigned to work schedules, and not the reverse." *Id*.

6

Arbitrator McKee also examined the language in Section 16, permitting pilots assigned to bases to develop their own schedules (with consecutive days off for each consecutive day worked). He concluded that since relief pilot assignments often result from pilot absences caused by illness, injury, vacation, etc., "Section 16.4 leads to the conclusions that (1) although Pilots participate in determining their own work schedules, the resulting schedules are attached to assignments or vacancies and not to individuals, and (2) Relief Pilots work according to the schedules of the vacancies they fill." *Id.* at 8-9. Therefore, to the extent that Section 17.1 granted the Company the right to utilize relief pilots instead of offering workover, "this language also can be taken to mean that the Company may bring in another Relief Pilot to work what would count as a workover for a different Relief Pilot." *Id.* at 9. Finally, the arbitrator decided that "[s]ince Relief Pilots work the schedules of the vacancies they fill, they are entitled to workover pay for working on their days off." *Id.*

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id.*

The Railway Labor Act limits the grounds for review of the arbitration award. Specifically, a dispute arising out of the interpretation or application of the CBA is considered a "minor" dispute, which is resolved through binding arbitration. *Consol. Rail Corp. v. Ry. Labor Exec. Ass'n*, 491 U.S. 299, 303 (1989). Judicial review of arbitration awards arising from minor disputes is limited to (1) whether the arbitrator failed to comply with the RLA; (2) whether the arbitrator failed to conform or confine himself to matters within the scope of his jurisdiction; and (3) whether the arbitrator's decision was the result of fraud or corruption. 45 U.S.C. § 159. An arbitrator acts within his jurisdiction when the award "draws its essence" from the agreement and does not "simply reflect the arbitrator's own notions of industrial justice." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987).

The Tenth Circuit has noted that a district court's review of a labor arbitrator's award is "among the narrowest known to the law." *L & B Assoc., Inc., v. Int'l Brotherhood of Electrical Workers, Local No. 113*, 461 F.3d 1195, 1197 (10th Cir. 2006) (citation omitted). As long as the arbitrator is "even arguably construing or applying the contract and acting within the scope of his authority," the decision should be upheld even if the court is convinced that he committed serious error. *Id.* Nonetheless, an arbitrator's discretion is not unlimited, and the award is legitimate "only so long as it draws its essence from the collective bargaining agreement." *Id.* An award does not draw its essence from the CBA if it is contrary to the express language of the contract or

8

"is so unfounded in reason and fact, so unconnected with the working and purpose of the agreement as to manifest infidelity to the obligation of the arbitrator or if viewed in the light of its language, its context, and any other indicia of the parties' intention, it is without factual support." *Id.* at 1197-98 (citations omitted).

## Discussion

The CBA provides that, "[n]either the Systems Board or Arbitrator shall have any jurisdiction to modify, add to or otherwise alter or amend any of the terms of this Agreement or to make any decision that has such an effect." CBA Section 7.4, Exh. A-3 to Plaintiff's Motion for S.J. (doc no 19-4) at 8.

Air Methods argues that the arbitrator's decision does not draw its essence from the contract. First, the company argues that there was no evidentiary bases for Arbitrator McKee's conclusion that relief pilots work according to a schedule of shifts that relates to their compensation, since the undisputed testimony is that relief pilots do not have a regular schedule. In addition, Air Methods argues that the arbitrator inappropriately applied a maxim of contract interpretation that "the expression of one thing is the exclusion of another." Although Full Time Pilots are defined as having a "regular work schedule" and Part Time Pilots are defined as not having a regular work schedule, the CBA is silent as to whether Relief Pilots and Temporary Full Time Pilots have regular schedules. Accordingly, Air Methods argues, there is no "expression of one thing" to the exclusion of others; rather, there is simply an absence of designation one way or another for two pilot categories. Air Methods also argues that the term "regular schedule," upon which the arbitrator placed such emphasis, does not appear anywhere in the CBA and the term "regular work schedule" applies only to development

9

of pilots schedules for those full time pilots assigned to a base, which clearly excludes relief pilots. Therefore, the company argues, the arbitrator essentially amended the CBA by imposing regular schedules on relief pilots, despite the express contract language and complete absence of evidence of how a regular schedule can or would be developed or administered for relief pilots.

In addition, the company argues that the award eviscerates the rights reserved in Section 17.1, which permits the company to utilize relief pilots (which all parties understood meant relief pilots working at their regular "straight time" salary) in lieu of providing workover at premium pay. Thus, AMC contends that the award means that the company can only use Part Time Pilots instead of providing workover, which is contrary to the express language of the CBA and is therefore beyond the jurisdiction of the arbitrator. Arbitrator McKee's determination that the company could bring in another relief pilot to work what would count as a workover for a different pilot also cannot work, because if the other relief pilot were "scheduled" then there would be no event warranting workover.

In response, the Union contends that the company is merely relitigating a disputed interpretation of the CBA. In addition, the Union argues that there is evidence supporting the arbitrator's determination that relief pilots work according to a regular schedule of shifts, since there is evidence that relief pilots receive from the company notice of their upcoming work location, travel days, and dates working at a base (in other words, a schedule). I disagree with the Union in this regard; evidence that relief pilots receive advance notice of their upcoming schedule is not the same as having a "regular work schedule," as outlined by the CBA (i.e., the consecutive days on and off

10

that full time pilots assigned to a base use). The Union also argues that the application of the maxim, "the expression of one thing is the exclusion of another" was appropriate because the express exclusion of "regular work schedule" for Part Time Pilots logically means that the Agreement confers regular schedules on all other pilots. The Union also notes that there is no evidence that the Company ever expressly proposed giving workover to relief pilots only after 182 ½ shifts during the negotiations. The Union also argues that the term "regular schedule," as used by Arbitrator McKee, indeed appears in Sections 19.1 and 19.4 of the CBA; again, however, this is incorrect as a factual matter, since the term used in the contract is "regular work schedule." Finally, the Union argues that the arbitrator properly interpreted the contract and did not exceed his jurisdiction.

Although I am aware of the narrow grounds for review, I am persuaded that Arbitrator McKee exceeded his jurisdiction by resorting to an intepretative maxim (and then reversing that maxim to create an entirely distinct rule of interpretation) to get to a result directly in conflict with the express terms of the contract and which is internally inconsistent. First, the express language of the CBA sets forth the primary difference between full-time pilots assigned to a base and relief pilots; the full time pilot (at a base) is assigned to a regular work schedule and the relief pilot fills vacancies at any base "as directed by the Company." Thus, there is no absence of expression as to scheduling for relief pilots. Rather, the very definition of a relief pilot (as demonstrated by the evidence at the trial) is one whose schedule is determined by the company, as opposed to the full time pilots assigned to a base, who determine their own schedules of consecutive days on and off pursuant to Sections 16.1 and 16.2. The fact that the CBA sets forth that Part Time/Per Diem Pilots do not work a regular work schedule does not mean that

11

the "as directed by the Company" language can be overridden by an implied term where none is needed.

Second, Arbitrator McKee's determination that a schedule is assigned to a pilot, rather than the reverse, has the effect of nullifying an express contract right given the company to use relief pilots in lieu of paying premium workover rates, as set forth in Section 17.1. For example, if full-time Pilot A assigned to a particular base has a work schedule of four days on, four days off and takes all eight days off for a vacation, the arbitrator's decision would make it impossible for the company to schedule a relief pilot at "straight time" during Pilot A's off days. This is because any pilot assigned to those days would be working a "regularly scheduled day off" for the vacancy by Pilot A at that particular base and would therefore be entitled to workover pay. Such a result would be completely inconsistent with the express contract language and the intent of the parties, as evidenced by the hearing testimony.[3]

The undisputed evidence presented at trial is that full time pilots assigned to a base determine their own regular work schedule and that relief pilots are given assignments by the company; any schedule for a relief pilot therefore is by definition and in practice irregular and at the company's discretion. According to the testimony at the hearing, the trade off for relief pilots is that they can live where they choose and their salaries are the same as a full-time pilot assigned to a base, regardless of how

---

[3]Alternatively, the arbitrator may have meant that the relief pilots are entitled to the same number of consecutive days off after working a certain number of consecutive days, and are entitled to workover for working during the "scheduled" days off. Again, however, given the absence of a regular schedule for relief pilots, these days cannot be considered "regularly scheduled" days off.

many shifts they actually work.[4] The arbitrator's determination that relief pilots work a "regular schedule," as opposed to simply a schedule of which they receive some advance notice, is contrary to the evidence, the express definition of a relief pilot, and to the overall scheme of the CBA, which appears to strike a careful balance in how the company can deal with vacancies at its bases without overburdening base pilots or being required to pay premium pay more than necessary. The arbitrator's analysis essentially changed the definition of workover from applying only to the full time pilots working on a "regularly scheduled day off" (i.e., as scheduled by the full time pilot) to any pilots, including relief pilots, who work that day, which in the case of a relief pilot is simply a day not previously scheduled.[5] Thus, I conclude that the arbitrator's award did not draw its essence from the CBA because it is contrary to the express language of the contract and is without factual support in light of the working and purpose of these portions of the agreement as shown by the language, context, past practice, and negotiating history.[6]

Whether the company's practice (paying relief pilots premium pay for working shifts over and above 182 ½ per year) violates some other provision of the CBA is not before me. Nonetheless, I do observe that in light of the past practice and the pay

---

[4]I note that no relief pilot testifying at the hearing complained about the company's practice of not paying workover to relief pilots until they worked the same number of shifts that a full time pilot assigned to a base would work in a year.

[5]Such a result is directly inconsistent with the express language of 17.1, which conditions any workover on the absence of any relief or part time pilots.

[6]It is also noteworthy that the CBA is silent as to when and how relief pilots would be awarded workover, since the "regularly scheduled day off" definition does not apply to them.

13

scheme, it appears to be an equitable solution to ensure that relief pilots do not earn premium pay while working fewer shifts than full time pilots assigned to a base.

Accordingly, it is ordered:

1. The Motion for Summary Judgment (doc no 18) filed by Plaintiff Air Methods Corporation is granted.

2. The arbitration award is vacated.

3. The Motion for Summary Judgment (doc no 17) filed by Defendants OPEIU and OPEIU Local 109 is denied.

4. Plaintiff may have its costs.

DATED at Denver, Colorado, on October 15, 2008.

BY THE COURT:

s/ Walker D. Miller
United States District Judge